**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Emerson SESCHILLIE, Defendant–**
**Appellant.**

No. 01–10147.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 13, 2002.

Filed Nov. 21, 2002.

Karen M. Wilkinson, Assistant Federal Public Defender, District of Arizona, Phoenix, AZ, for the defendant-appellant.

Joseph C. Welty, Assistant United States Attorney, District of Arizona, Phoenix, AZ, for the plaintiff-appellee.

Before: SNEED, HUG and BERZON, Circuit Judges.

BERZON, Circuit Judge.

One evening Emerson Seschillie fired shots at four people, including himself, at a bead stand on the Navajo Reservation. At his jury trial, Seschillie's sole defense with regard to all the shootings was that he did not intend to pull the trigger of his .357 revolver. Rather, Seschillie argued, each time the gun was fired he and someone else were struggling for control of the gun, causing him to accidentally fire it. We must decide whether the jury conviction should be set aside because (1) the trial court prohibited Seschillie's expert witness from testifying about the possibility that the gun was accidentally discharged or (2) because the trial court ordered from the courtroom the expert witness Seschillie called to testify to the scientific plausibility of this version of events. We conclude that the conviction should stand.

## I. BACKGROUND

Late in the afternoon of September 22, 1999, Bernita Jensen (for clarity "Bernita") and her older sister Rosie Jensen ("Rosie") stopped by the home of Bernita's off-again, on-again boyfriend Seschillie. Seschillie was drunk when they arrived. After a brief exchange with Seschillie, Bernita and Rosie drove off.

Later in the evening, Bernita and Rosie drove to Bernita's roadside bead stand, where they joined Bernita's employee, Gloria Webster. Soon after Bernita and Rosie entered the bead stand, Seschillie drove up, entered the stand and bickered with Bernita. Finally, Bernita said, "Emerson, you are getting to be too mean, you are a little mean. And I don't want to see you anymore."

After this exchange, Bernita watched Seschillie leave the bead stand. He returned, however, and yelled, "You don't love me anymore." Bernita turned around to see Seschillie pointing a gun at her head. She grabbed the barrel of the gun and pushed it down until Seschillie stiffened. The gun went off, wounding Bernita. Bernita then managed to push Seschillie's arm so that the gun pointed up.

At this point, Bernita fled. Rosie and Webster ran to Seschillie. Webster grabbed the gun with one hand and Seschillie's wrist with the other; Rosie also grabbed Seschillie's wrist. Seschillie continued to hold onto the gun. The gun then went off once, firing a bullet into Rosie's leg, and then went off once more, striking Seschillie in the leg.

No longer a part of the struggle, the wounded Rosie watched as Webster and Seschillie continued to fight over the gun. Webster and Seschillie fell onto the couch. Webster was on her back and Seschillie was on top of her with the gun pointed at her head. As Webster tried to point the gun away from her face, the gun went off yet again, grazing the side of Webster's head.

Seschillie then left the bead stand. Rosie and Webster heard another shot and then glass breaking. Seschillie thereupon returned, threatened the two women, and asked about Bernita's whereabouts. Seschillie remained in the bead stand until, about an hour later, the police arrived and arrested him. Seschillie was taken to the

hospital, where it was determined that he had a blood alcohol level of 0.27.

At trial, Seschillie's defense was that the gun accidentally discharged each time it fired. To bolster this assertion, Seschillie planned to have his only witness (Seschillie did not testify), criminologist Ray Gieszl, testify about the possibility of accidental discharge when people are struggling over the possession of a gun. In testimony outside the presence of the jury, Gieszl described several scenarios that can lead to an accidental discharge, including: (1) balance disturbance; (2) startle response; (3) off-hand use ("sympathetic response"); and (4) contested control.[1] Gieszl's testimony outside the presence of the jury also indicated that each time Seschillie fired the gun, it was possible that the firing was an accident, because more than one person had a hand on the gun each time.

Following Gieszl's testimony outside the presence of the jury, the district court held that Gieszl could at trial testify generally about the accidental discharge theories but could not render an opinion as to whether the shootings in this case were accidental, nor could he identify facts in the witnesses' testimony that were consistent with accidental discharge. At trial, Gieszl testified generally regarding: (1) balance disturbance; (2) startle response; and (3) off-hand use. He also explained that each of these three scenarios could be triggered when two or more people fight over control of a gun.

During the trial, the government did not object to Gieszl's presence in the courtroom. The district court, however, excluded Gieszl from the courtroom.

The jury found Seschillie guilty of nine counts stemming from these events, including attempted murder. Seschillie appeals.

## II. ANALYSIS

Seschillie argues that the district court erred both in refusing to let Gieszl opine as to whether the shootings in this case were accidental and by excluding Gieszl from the courtroom when the victims testified regarding the details of the various struggles over the gun. We do not agree with either contention.

### A. Exclusion of Expert Opinion

Although the district court allowed Gieszl to testify generally about the accidental discharge theories, it did not allow Gieszl to offer an opinion concerning whether the four shootings at issue in this case were accidental or to comment on the particular facts of the case. Seschillie urges that because an expert may testify regarding "an ultimate issue to be decided by the trier of fact," Fed. Rule Evid. 704(a), the district court should have permitted all of Gieszl's testimony, including his opinion on the ultimate issue in the case: whether the shootings were, in fact, accidental. We review the district court's determination for an abuse of discretion. *United States v. Ortland*, 109 F.3d 539, 544 (9th Cir.1997).

---

1. Gieszl further explained the theories he described as follows: (1) Balance disturbance: When someone loses his balance, there is a muscle response initiated and he "will grip or crunch down on the firearm while pulling the trigger." (2) Startle response: When someone is surprised his physical reaction is to clench his hands. (3) Off-use hand or sympathetic response: Due to an "interconnective neural response between the two limbs," if a person grips or grasps something with the hand not holding the firearm he will sometimes involuntary pull the trigger with the other hand. (4) Contested control: A person will sometimes involuntary fire a gun when two or more people are struggling for control of the gun.

In some circumstances, to be sure, an expert may render an opinion on an "ultimate issue." *See generally* Fed.R.Evid. 704. We need not decide whether proffering such an opinion would have been proper here. The district court excluded the contested portion of Gieszl's testimony not only on the ultimate issue theory but also on the alternate rationale that the subject did not require expert illumination. The district court did not abuse its discretion in so ruling.[2]

Whether or not expert testimony is appropriate in a particular circumstance is governed by Fed. Rule Evid. 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

(Emphasis added).

■ The district court concluded that the jury could determine, as a matter of "common sense," whether the shootings as described by the victims were accidental according to Gieszl's theories, and would not be assisted in that determination by any specialized knowledge. "A district court does not abuse its discretion when it refuses expert testimony where the subject does not need expert 'illumination' and the proponent is otherwise able to elicit testimony about the subject." *United States v. Ortland*, 109 F.3d 539, 545 (9th Cir.1997). That someone struggling over a gun could experience some of the factors

Gieszl identified as causing accidental fire, such as a loss of balance, a surprised reaction, or a need to use his other hand is a matter which anyone could figure out for herself.

## B. Sequestration of Expert

Seschillie also argues that the district court erred in excluding Gieszl from the courtroom during trial and that Seschillie was prejudiced thereby. Although we conclude that the district court abused its discretion in excluding Gieszl, the error was harmless.

### 1) The District Court Abused Its Discretion in Excluding Gieszl

■ Although the government did not object to Gieszl's presence in the courtroom during the victims' testimony, the district court, acting *sua sponte*, ordered Gieszl from the courtroom shortly after the trial commenced. Federal Rule of Evidence 615 ("Rule 615") governs the exclusion of witnesses from the courtroom:

> At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause, or (4) a person authorized by statute to be present.

"The purpose of this rule is to prevent witnesses from 'tailoring' their testimony to that of earlier witnesses." *United*

---

**2.** Because we conclude that this basis for exclusion was not an abuse of discretion, we do not consider the district court's other stated reasons for exclusion.

*States v. Ell,* 718 F.2d 291, 293 (9th Cir. 1983).

■ Seschillie argues that Gieszl's presence was "essential to the presentation of [his] cause" and that Gieszl therefore fell within the third exception to Rule 615. We review the district court's ruling regarding the applicability of Rule 615(3) for an abuse of discretion. *See Alexander Shokai v. Internal Revenue Service,* 34 F.3d 1480, 1486 (9th Cir.1994) (reviewing for abuse of discretion a decision under Tax Court Rule 415, which mirrors Rule 615, a district court's decision that an expert was not essential); *Opus 3 Ltd. v. Heritage Park, Inc.,* 91 F.3d 625, 629 (4th Cir.1996) (reviewing for abuse of discretion decision that expert witness did not meet criteria of Rule 615(3)); *Polythane Sys., Inc. v. Marina Ventures Int'l, Ltd.,* 993 F.2d 1201, 1209 (5th Cir.1993) (same); *Malek v. Fed. Ins. Co.,* 994 F.2d 49, 54 (2d Cir.1993) (same); *cf. Breneman v. Kennecott Corp.,* 799 F.2d 470, 473 (9th Cir.1986) (reviewing for abuse of discretion a district court's decision that party could designate multiple representatives according to Rule 615(2)).[3]

In many circumstances, a potential expert witness will be an "essential party" within the meaning of Rule 615(3). The Advisory Committee Notes to Rule 615(3) contemplate as much, stating that the exception includes "an expert needed to advise counsel in the management of litiga-

tion." *See also Alexander Shokai,* 34 F.3d at 1486 (applying a parallel statute but concluding that petitioners had not demonstrated that his expert was "necessary for the presentation of the case."); *see generally Opus 3,* 91 F.3d at 629; *Malek,* 994 F.2d at 54; *Polythane,* 993 F.2d at 1209; *United States v. Mohney,* 949 F.2d 1397, 1404 (6th Cir.1992); *Morvant v. Construction Aggregates Corp.,* 570 F.2d 626, 629–630 (6th Cir.1978).

■ We decline to conclude, however, that an expert witness will *always* meet the criteria of Rule 615(3). The reason is simple: "[H]ad the framers intended it, they would have said so, or added a fourth exception." *Morvant,* 570 F.2d at 629–630. Instead, the framers indicated that the "essential nature" of a witnesses' presence must "be shown by [the] party." Fed. Rule of Evid. 615(3). In addition, although an expert witness does not normally testify to facts, thereby nullifying the need for sequestration, there are circumstances in which an expert may also give factual testimony. *Morvant,* 570 F.2d at 630. For example, a crime expert might investigate a crime scene and later testify to both factual observations and expert conclusions. The burden, therefore, remains on the party requesting the Rule 615(3) exception to make "a fair showing" that "the expert witness is in fact required for the management of the case." *Morvant,* 570 F.2d at 630; *accord Opus,* 91 F.3d at 629.

---

**3.** A different standard applies when a party requests an exclusion and a district court fails to exclude a witness under Rule 615 if no exception applies. Because Rule 615 states that the court, at the request of a party, *shall* order witnesses excluded, "[t]he rule makes the exclusion a matter of right and the decision is no longer committed to the court's discretion as it once was." *United States v. Brewer,* 947 F.2d 404, (9th Cir.1991) (request for witness exclusion denied because trial court believed, improperly, that Rule 615 did not apply during a pretrial motion—no Rule

615 exception even arguably applied); *United States v. Ell,* 718 F.2d 291, 293–4 (9th Cir. 1983) (trial judge improperly denied motion to sequester witness who had already testified in case-in-chief but would later testify in rebuttal—no Rule 615 exception even arguably applied). While the court is stripped of discretion and must order sequestration if a party so requests and no Rule 615 exception applies, the decision as to *whether* a Rule 615 exception applies is reviewed for abuse of discretion. *Breneman,* 799 F.2d at 473; *Alexander Shokai,* 34 F.3d at 1486.

**1214**

■ Applying this standard, we conclude that the district court abused its discretion in excluding Gieszl from the courtroom. Seschillie did make the required "fair showing" that Gieszl's presence was "essential." *Morvant,* 570 F.2d at 629–630. When the district court excluded Gieszl, it had not yet precluded Gieszl from applying his opinions concerning accidental discharge of a gun to the facts of this case. Therefore, at the time of the exclusion, the district court should have considered Seschillie's explanation that Gieszl needed to hear the testimony of victims Bernita, Rosie, and Webster in order properly to provide opinion evidence.

Nor were there any countervailing reasons to sequester Gieszl. Unlike an expert excluded because he is both an expert witness and a fact witness, *see Opus,* 91 F.3d at 629, Gieszl was not a fact witness. These circumstances favor allowing Gieszl to observe trial: "[A]n expert who is not expected to testify to facts, but only assumes facts for purposes of rendering opinions, might just as well hear all of the trial testimony so as to be able to base his opinion on more accurate factual assumptions." *Id.* Indeed, even the government agreed that Gieszl's presence during trial would be appropriate.

The district court dismissed this argument, noting that Gieszl could read the trial transcripts. Trial transcripts are an imperfect substitute for live testimony. The imperfection was patent in this case because some of the witness testimony was demonstrative rather than verbal.

■ Further, the district court excluded Gieszl primarily because it felt that his presence would send a false message to the jury by creating the impression that the expert has "some added substance." Rule 615, however, authorizes exclusion "so that [witnesses] cannot hear the testimony of other witnesses," not for other reasons. Also, the exception contained in

Rule 615(3) is for persons "essential to the presentation of the parties' cause." If a person meets that criterion, exclusion is "not authorize[d]." Rule 615. Excluding Gieszl because of the impression his presence might make on the jury, even though he met the Rule 615(3) exclusion criterion, was an abuse of discretion. *See United States v. Working,* 287 F.3d 801, 807 (9th Cir.2002) (a district court abuses its discretion when its ruling is guided by erroneous legal conclusions); *United States v. Morales,* 108 F.3d 1031, 1035 (9th Cir.1997) (same). We must next consider whether this error prejudiced Seschillie.

### 2) *The Error was Harmless*

■ Even though excluding Gieszl was improper, we conclude that Seschillie was not prejudiced thereby. 28 U.S.C. § 2111 (error not affecting substantial rights must be disregarded); Fed. R.Crim.P. 52(a) (same). Because the error is not of constitutional magnitude, we apply the harmless error standard for non-constitutional error and "reverse if there is a 'fair assurance' of harmlessness, or stated otherwise, unless it is more probable than not that the error did not materially affect the verdict." *United States v. Morales,* 108 F.3d 1031, 1040 (9th Cir.1997) (en banc). This standard requires that the Government show a "fair assurance" that the verdict was not substantially swayed by error. Relying on *Breneman,* 799 F.2d 470, the government argues that Seschillie bears the burden of persuading us that prejudice resulted from the misapplication of Rule 615. We disagree.

*Breneman* noted that "Breneman has made no showing that she was in any way prejudiced by [the Rule 615 error]." As authority for this proposition, *Breneman* relied, in part, on *United States v. West,* 607 F.2d 300, 306 (9th Cir.1979), which held: "Since appellant made *no attempt to*

*inform* the district court why failure to exclude witnesses during the prosecutor's opening statement might prejudice appellant's case, we cannot say that the court abused its discretion in denying the motion." We conclude that in *Breneman,* as in *West,* the court merely pointed to the complete absence of any indication of prejudice in the record before it; it did not establish a rule of decision in close cases where the burden of persuasion might matter. Similarly, in *Alexander Shokai,* 34 F.3d at 1487 the court's statement that petitioners "have not established prejudice" is best understood as a statement about the paucity of any indication of prejudice in the record, not a rule of decision regarding the burden of persuasion in cases of equipoise.

■ Our reading of *Breneman* and *Alexander Shokai* is reinforced by several considerations. First, in *Ell,* 718 F.2d at 293–94, this court squarely placed the burden of persuasion on the government to demonstrate that no prejudice resulted from a Rule 615 violation. *Accord United States v. Brewer,* 947 F.2d 404, 411 (9th Cir.1991). *Breneman* and *Alexander Shokai* did not purport to distinguish or overrule *Ell,* so we should strive to read them as consistent with *Ell.* Second, even if we accepted the government's interpretation of *Breneman* and *Alexander Shokai* (both civil cases), we would still be precluded from placing the burden of persuasion on Seschillie in this criminal case because of our subsequent en banc opinion in *Morales,* 108 F.3d at 1040.[4] In the context of nonconstitutional error in criminal cases "we *must* reverse ... *unless* it is more probable than not" that the error was

harmless. *Id.* (emphasis added) That is, in cases of "equipoise," we reverse. *United States v. Mitchell,* 172 F.3d 1104, 1111 (9th Cir.1999). Since *Morales,* we have consistently applied that rule. *See generally United States v. Jimenez,* 214 F.3d 1095, 1099 (9th Cir.2000); *United States v. Mett,* 178 F.3d at 1066 (9th Cir.1999); *United States v. Bauer,* 132 F.3d 504, 510 (9th Cir.1997). We discern no reason why Rule 615 warrants an exception.

■ Finally, placing the risk of equipoise on the government is consistent with the post *Breneman* and *Alexander Shokai* precedent of *O'Neal v. McAninch,* 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995) which, although a habeas case, contains reasoning pertinent to an analysis of nonconstitutional error on direct review. As *O'Neal* explains, 513 U.S. at 436–37, 115 S.Ct. 992, in analyzing the harmless error issue it is rarely even useful to frame the analysis in terms of the government's burden of persuasion. Because "harmless error analysis is a purely legal question which lies outside the realm of fact-finding," we ordinarily "dispense with burdens of proof and presumptions" and ask the "conceptually clearer" question: "Do I, the judge, think that the error substantially influenced the jury's decision?" *Payton v. Woodford,* 299 F.3d 815, 827–828 (9th Cir. 2002) (internal quotation marks omitted) (quoting, in part, *O'Neal,* 513 U.S. at 436, 115 S.Ct. 992). Only in the unusual case where "the record is so evenly balanced that a conscientious judge is in grave doubt as to the harmlessness of an error" will the burden of persuasion matter. *O'Neal,* 513 U.S. at 437, 115 S.Ct. 992. In such rare cases of equipoise, however,

---

4. We do not necessarily suggest that *Breneman* and *Alexander Shokai* should indeed be distinguished as civil, rather than criminal cases. To the contrary, the Supreme Court has indicated that the burden of persuasion in harmless error analysis is similar in both civil and criminal cases. *O'Neal v. McAninch,* 513 U.S. 432, 441, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). For this additional reason, we conclude that we are correct in reading *Breneman* and *Alexander Shokai* as consistent with *Ell* and *Morales.*

*O'Neal* indicates that reversal is appropriate. *Id.* at 438, 115 S.Ct. 992.[5] We therefore conclude that, although the burden of persuasion will seldom matter, those rare cases of an "evenly balanced" record must be resolved in favor of the defendant.

In answering the dispositive question, whether the error substantially influenced the jury's decision, we give particular scrutiny to some Rule 615 violations. For example, when a district court *fails* to exclude a fact witness, and the witness has an opportunity to hear relevant fact testimony of other witnesses, the government may have difficulty convincing us that the resulting error was harmless. As we stated in *Ell:*

> It may be impossible to tell how a witness' testimony would have differed had the defendant's motion to exclude been granted. Therefore, we hold that when a court fails to comply with Rule 615, prejudice is presumed and reversal is required unless it is manifestly clear from the record that the error was harmless or unless the prosecution proves harmless error by a preponderance of the evidence. *See United States v. Castillo,* 615 F.2d 878, 883 (9th Cir. 1980) (violation of evidentiary rule judged by "more probably than not harmless" standard).

718 F.2d at 293–294. Thus, although *Ell* adopted, in the context of Rule 615 violations, the familiar "more probable than not harmless" standard (and explicitly rejected an automatic reversal rule), *Ell* encouraged courts to be skeptical before concluding that a Rule 615 violation was harmless if a fact witness was erroneously allowed to hear pertinent testimony. *Id.*

The rationale which compels particular scrutiny in that scenario, however, does not apply where, as here, the court *does* exclude an expert witness, albeit improperly. Once witness influence takes place, it "may be impossible to tell how a witness' testimony would have differed had the defendant's motion to exclude been granted." *Ell,* 718 F.2d at 293–4. In contrast, a party whose expert is improperly excluded from trial can alert the reviewing court to the type of testimony and assistance she could have provided but for the exclusion. *See e.g. Malek v. Federal Insurance Company,* 994 F.2d 49, 53–4 (9th Cir.1993) (holding that exclusion of expert, in conjunction with other trial errors, caused prejudice where the expert identified avenues of cross examination that counsel could have pursued if the expert were present to give advice). Unlike the black box created by a witness influence scenario, such expert assistance can then be "quantitatively assessed" in the context of the remaining evidence. *Arizona v. Fulminante,* 499 U.S. 279, 308, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). An ordinary harmless error inquiry is therefore sufficient, without the skepticism which may be warranted where a witness is erroneously permitted to attend trial.

---

**5.** Although *Payton* and *O'Neal* evaluated harmless error in the context of a habeas case, the reasoning applies to a review of nonconstitutional error on direct appeal. In both circumstances, harmless error analysis is a legal rather than factual determination, unaided by burdens and presumptions. Moreover, in both circumstances we apply the harmless standard announced in *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). *See United States v. Brooke,* 4 F.3d 1480, 1488 (9th Cir.1993) (stating that the standard for nonconstitutional error on direct review is governed by *Kotteakos*); *accord Bauer,* 132 F.3d 504 (9th Cir. 1997). *See also O'Neal,* 513 U.S. at 437–41, 115 S.Ct. 992 (applying the *Kotteakos* standard in a habeas case, and equating the *Kotteakos* standard with standard codified in the federal harmless error rule of 28 U.S.C. § 2111).

 Tuning to the current case, we can say with "fair assurance" that the error was harmless. *Mitchell*, 172 F.3d at 1111; *Morales*, 108 F.3d at 1040. First, we note that Gieszl had ample opportunity to familiarize himself, generally, with the circumstances of the case by reviewing the pre-trial witness statements and reviewing the trial transcripts.[6] Certainly, a trial transcript is an imperfect substitute, especially so where, as here, some of the witness' testimony was demonstrative rather than verbal. These imperfections, however, were harmless in this case. We have concluded that the district court properly precluded Gieszl from testifying regarding particular facts (although the court had not so ruled at the time of the exclusion order). Because Gieszl had ample opportunity to familiarize himself with the general circumstances of the case and was not allowed to comment on any particular facts, we fail to see how his exclusion from the courtroom prejudiced Seschillie.

We also reject Seschillie's vague, post-hoc argument, advanced for the first time in his reply brief, that Gieszl's presence was essential because he could have assisted Seschillie's counsel in performing cross-examination. Generally, arguments not raised in the opening brief are deemed waived. *United States v. Alexander*, 287 F.3d 811, 817 n. 2 (9th Cir. 2002). Even if we were to consider this argument, it would fail because Seschillie identifies no specific avenues of cross examination that Seschillie's counsel would have pursued had Gieszl been available to render advice.

A comparison to *Malek* is instructive. In that arson case, the court found that the improper exclusion of a fire expert witness contributed to prejudice because the ex-

pert could have rendered useful advice regarding cross-examination. 994 F.2d at 52. Specifically, the fire expert could have instructed counsel to elicit the fact that copper tubing had not melted during the fire, a fact that, as the fire expert could have later explained to the jury, was inconsistent with the conclusion that the fire was caused by arson. *Id.* In that case then, the expert's absence prevented the defendant from potentially eliciting, and later explaining, important factual information.

Here, Seschillie has not identified any missed avenues of cross-examination which would have been potentially fruitful. Absent any such indication, we can say with fair assurance that the lack of opportunity to assist in cross-examination was harmless. *See Opus*, 91 F.3d at 629 n. 2 (rejecting argument that expert was needed to advise counsel when the appellant had "not articulate[d] any specific harm to counsel that resulted.").

### CONCLUSION

For the reasons stated above, we **AFFIRM**.

---

6. The three victims testified on October 12, 2000 and October 13, 2000 but Gieszl did not take the stand until October 17, 2000. *Compare Malek*, 994 F.2d at 53–54 (excluding ex-

pert contributed to prejudice when expert given only 10 minutes to review relevant trial transcripts).