Darlene JESPERSEN, Plaintiff–
Appellant,

v.

HARRAH'S OPERATING COMPANY,
INC., Defendant–Appellee.

No. 03–15045.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 3, 2003.

Filed Dec. 28, 2004.

Jennifer C. Pizer, Lambda Legal Defense & Education Fund, Inc., Los Angeles, CA, for the plaintiff-appellant.

Veronica Arechederra Hall, Littler Mendelson, Las Vegas, NV, for the defendant-appellee.

Allen Lichtenstein, American Civil Liberties Union of Nevada, Las Vegas, NV, for amici curiae American Civil Liberties Union of Nevada, Northwest Women's Law Center, California Women's Law Center, and The Gender Public Advocacy Coalition.

Jeffrey W. Erdman, Bennett & Erdman, Los Angeles, CA, for amici curiae National Employment Lawyers Association, Alliance for Workers' Rights, and The Legal Aid Society—Employment Law Center.

Joseph E. Schuler, Littler Mendelson, Washington, D.C., for amici curiae Council for Employment Law Equity, American Hotel & Lodging Association, and California Hotel & Lodging Association.

Before: TASHIMA, THOMAS, and
SILVERMAN, Circuit Judges.

TASHIMA, Circuit Judge:

Plaintiff Darlene Jespersen, a bartender at Harrah's Casino in Reno, Nevada, brought this Title VII action alleging that her employer's policy requiring that certain female employees wear makeup discriminates against her on the basis of sex. The district court granted summary judgment for Harrah's, holding that its policy did not constitute sex discrimination because it imposed equal burdens on both sexes. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

## I.

The following facts are undisputed. Darlene Jespersen was a bartender at the sports bar in Harrah's Casino in Reno, Nevada, for nearly 20 years. She was an outstanding employee. Over the years, Jespersen's supervisors commented that she was "highly effective," that her attitude was "very positive," and that she made a "positive impression" on Harrah's guests. Harrah's customers repeatedly praised Jespersen on employee feedback forms, writing that Jespersen's excellent service and good attitude enhanced their experience at the sports bar and encouraged them to come back.

Throughout the 1980s and '90s Harrah's encouraged its female beverage servers to wear makeup, but wearing makeup was not a formal requirement. Although Jespersen never cared for makeup, she tried wearing it for a short period of time in the 1980s. But she found that wearing makeup made her feel sick, degraded, exposed, and violated. Jespersen felt that wearing makeup "forced her to be feminine" and to become "dolled up" like a sexual object, and that wearing makeup actually interfered with her ability to be an effective bartender (which sometimes required her to deal with unruly, intoxicated guests) because it "took away [her] credibility as an individual and as a person." After a few weeks, Jespersen stopped wearing makeup because it was so harmful to her dignity and her effectiveness behind the bar that she could no longer do her job. Harrah's did not object to Jespersen's choice not to wear makeup and Jespersen continued to work at the sports bar and receive positive performance reviews for over a decade.

In February 2000, Harrah's implemented its "Beverage Department Image Transformation" program at 20 Harrah's locations, including its casino in Reno. The goal of the program was to create a "brand standard of excellence" throughout Harrah's operations, with an emphasis on guest service positions. The program imposed specific "appearance standards" on each of its employees in guest services, including heightened requirements for beverage servers. All beverage servers were required to be "well groomed, appealing to the eye, be firm and body toned, and be comfortable with maintaining this look while wearing the specified uniform." In addition to these general appearance standards applicable to both sexes, there were gender-specific standards for male and female beverage servers. Female beverage servers were required to wear stockings and colored nail polish, and they were required to wear their hair "teased, curled, or styled." Male beverage servers were prohibited from wearing makeup or colored nail polish, and they were required to maintain short haircuts and neatly trimmed fingernails.[1]

---

1. The text of the appearance standards provides, in relevant part, as follows:

All Beverage Service Personnel, in addition to being friendly, polite, courteous and responsive to our customer's needs, must possess the ability to physically perform the essential factors of the job as set forth in the standard job descriptions. They must be well groomed, appealing to the eye, be firm and body toned, and be comfortable with

Harrah's called its new appearance standards the "Personal Best" program. In order to enforce the "Personal Best" standards, Harrah's required each beverage service employee to attend "Personal Best Image Training" prior to his or her final uniform fitting. At the training, "Personal Best Image Facilitators" instructed Harrah's employees on how to adhere to the standards of the program and tested their proficiency. At the conclusion of the training, two photographs (one portrait and one full body) were taken of the employee looking his or her "Personal Best." Each employee's "Personal Best" photographs were placed in his or her file and distributed to his or her supervisor. The supervisors used the "Personal Best" photographs as an "appearance measurement" tool, holding each employee accountable to look his or her "Personal Best" on a daily basis. Jespersen acknowledged receipt of the policy and committed to adhere to the appearance standards for her position as a beverage bartender in March 2000.

Shortly thereafter, however, the "Personal Best" standards were amended such that in addition to the existing appearance standards, all female beverage servers (including beverage bartenders) were required to wear makeup.[2] As before, male beverage servers were prohibited from wearing makeup. Because of her objection to wearing makeup, Jespersen refused to comply with the new policy. In July 2000, Harrah's told Jespersen that the makeup requirement was mandatory for female beverage service employees and gave her 30 days to apply for a position that did not require makeup to be worn. At the expiration of the 30–day period, Jespersen had not applied for another job, and she was terminated.

After exhausting her administrative remedies with the Equal Employment Opportunity Commission, Jespersen brought this action alleging that Harrah's makeup requirement for female beverage servers constituted disparate treatment sex discrimination in violation of 42 U.S.C. § 2000e–2(a) ("Title VII"). The district

maintaining this look while wearing the specified uniform. Additional factors to be considered include, but are not limited to, hair styles, overall body contour, and degree of comfort the employee projects while wearing the uniform.

\* \* \*

Beverage Bartenders and Barbacks will adhere to these additional guidelines:

Overall Guidelines (applied equally to male/female):

- Appearance: Must maintain Personal Best Image portrayed at time
- Jewelry, if issued, must be worn. Otherwise, tasteful and simple jewelry is permitted; no large chokers, chains or bracelets.
- No faddish hairstyles or unnatural colors are permitted.

Males:

- Hair must not extend below top of shirt collar. Ponytails are prohibited.
- Hands and fingernails must be clean and nails neatly trimmed at all times. No colored polish is permitted.

- Eye and facial makeup is not permitted.
- Shoes will be solid black leather or leather type with rubber (non skid) soles.

Females:

- Hair must be teased, curled, or styled every day you work. Hair must be worn down at all times, no exceptions.
- Stockings are to be of nude or natural color consistent with employee's skin tone. No runs.
- Nail polish can be clear, white, pink or red color only. No exotic nail art or length.
- Shoes will be solid black leather or leather type with rubber (non skid) soles.

2. The amended policy required that "[m]ake up (foundation/concealer and/or face powder, as well as blush and mascara) must be worn and applied neatly in complimentary colors," and that "[l]ip color must be worn at all times."

court granted Harrah's motion for summary judgment, holding that the "Personal Best" policy did not run afoul of Title VII because (1) it did not discriminate against Jespersen on the basis of "immutable characteristics" associated with her sex, and (2) it imposed equal burdens on both sexes. Jespersen timely appealed from the judgment.

## II.

We review the grant of summary judgment *de novo*. *United States v. City of Tacoma*, 332 F.3d 574, 578 (9th Cir.2003). Summary judgment is proper where no genuine issues of material fact remain in dispute, such that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party has the initial burden of informing the court of the basis for its motion and identifying the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the moving party is not the party bearing the burden of proof at trial, it can meet its initial burden simply by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (quoting Fed. R.Civ.P. 56(c)); *see also Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1105 (9th Cir.2000). Once the moving party has met its initial burden, the non-moving party must produce some evidence showing that there remains a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is "genuine" only where there is sufficient evidence for a reason-

able fact finder to find for the non-moving party. *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir.2001) (citing *Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505). We view the evidence in the light most favorable to the non-moving party. *Id.*

## III.

■ Title VII prohibits employers from discriminating against "any individual with respect to ... compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1). In order to prevail on a Title VII disparate treatment sex discrimination claim, an employee need only establish that, but for his or her sex, he or she would have been treated differently. *UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 200, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991) (citing *Los Angeles Dep't of Water & Power v. Manhart*, 435 U.S. 702, 711, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978)). Although the employee must prove that the employer acted intentionally, the intent need not have been malevolent. *Id.* at 199, 111 S.Ct. 1196 ("Whether an employment practice involves disparate treatment through explicit facial discrimination does not depend on why the employer discriminates but rather on the explicit terms of the discrimination.").[3]

■ Pursuant to the "Personal Best" program, women are required to wear makeup, while men are prohibited from doing so. Women are required to wear their hair "teased, curled, or styled" each day, whereas men are only required to maintain short haircuts. We must decide whether these standards are discriminatory; whether they are "based on a policy

---

**3.** Even if intentional discrimination is shown, an employer can escape liability if sex "is a bona fide occupational qualification ["BFOQ"] reasonably necessary to the normal operation of that particular business or enterprise." 42 U.S.C. § 2000e–2(e)(1). There is no BFOQ issue on this appeal.

which on its face applies less favorably to one gender ...." *Gerdom v. Continental Airlines, Inc.*, 692 F.2d 602, 608 (9th Cir. 1982). If so, then Harrah's would have discriminated against Jespersen "because of ... sex." 42 U.S.C. § 2000e–2(a)(1); *see id.*

We have previously held that grooming and appearance standards that apply differently to women and men do not constitute discrimination on the basis of sex. In *Baker v. Cal. Land Title Co.*, 507 F.2d 895 (9th Cir.1974), employees challenged their employer's rule banning men, but not women, from having long hair. *Id.* at 896. We concluded that grooming and dress standards were entirely outside the purview of Title VII because Congress intended that Title VII only prohibit discrimination based on "immutable characteristics" associated with a worker's sex. *Id.* at 897 ("Since race, national origin and color represent immutable characteristics, logic dictates that sex is used in the same sense rather than to indicate personal modes of dress or cosmetic effects."); *see also Fountain v. Safeway Stores Inc.*, 555 F.2d 753, 755 (9th Cir.1977) ("It is clear that regulations promulgated by employers which require male employees to conform to different grooming and dress standards than female employees is not sex discrimination within the meaning of Title VII."). Because grooming and dress standards regulated "mutable" characteristics such as hair length, we reasoned, employers that made compliance with such standards a condition of employment discriminated on the basis of their employees' appearance, not their sex.

Our later cases recognized, however, that an employer's imposition of more stringent appearance standards on one sex than the other constitutes sex discrimination even where the appearance standards regulate only "mutable" characteristics such as weight. *Gerdom*, 692 F.2d at 605–06. In *Frank v. United Airlines, Inc.*, 216 F.3d 845 (9th Cir.2000) (en banc), a class of female flight attendants challenged their employer's weight restrictions as a violation of Title VII because women were held to more strict weight limitations than were men. The employer insisted that all employees maintain a weight that corresponded to the "desirable" weight for their height as determined by an insurance company table, but women were required to maintain the weight corresponding to women of "medium" build, whereas men were permitted to maintain the weight corresponding to men of "large" build. *Id.* at 848. Citing *Fountain*, the employer argued that because the weight restrictions were mere "appearance" standards, they were not subject to Title VII. *Id.* at 854. We rejected the employer's argument, holding that "[a] sex-differentiated appearance standard that imposes unequal burdens on men and women is disparate treatment that must be justified as a BFOQ." *Id.* at 855; *see also Carroll v. Talman Fed. Sav. & Loan Ass'n*, 604 F.2d 1028, 1032 (7th Cir.1979) (holding that employer's policy requiring female employees to wear uniforms but permitting male employees to wear "appropriate business attire" of their choosing was sex discrimination in violation of Title VII). Although employers are free to adopt *different* appearance standards for each sex, they may not adopt standards that impose a greater burden on one sex than the other. *Frank*, 216 F.3d at 855.

Although in *Frank* we characterized the weight standards at issue as "appearance standards," *id.*, we have, as yet, had no occasion to apply the "unequal burdens" test to gender-differentiated dress and grooming requirements. In *Frank* and *Gerdom*, we were called upon only to compare the relative burdens of different weight limitations imposed on male and female employees. In those cases our task

was simple because it was apparent from the face of the policies at issue that female flight attendants were subject to a more onerous standard than were males. *See Frank*, 216 F.3d at 854; *Gerdom*, 692 F.2d at 608.

In order to evaluate the relative burdens the "Personal Best" policy imposes, we must assess the actual impact that it has on both male and female employees. In doing so we must weigh the cost and time necessary for employees of each sex to comply with the policy. Harrah's contends that the burden of the makeup requirement must be evaluated with reference to all of the requirements of the policy, including those that burden men only, such as the requirement that men maintain short haircuts and neatly trimmed nails. Jespersen contends that the only meaningful appearance standard against which the makeup requirement can be measured is the corresponding "no makeup" requirement for men. We agree with Harrah's approach. Because employers are permitted to apply different appearance standards to each sex so long as those standards are equal, our task in applying the "unequal burdens" test to grooming and dress requirements must sometimes involve weighing the relative burdens that particular requirements impose on workers of one sex against the distinct requirements imposed on workers of the other sex.[4]

Jespersen contends that the makeup requirement imposes "innumerable" tangible burdens on women that men do not share because cosmetics can cost hundreds of dollars per year and putting on makeup requires a significant investment in time.

There is, however, no evidence in the record in support of this contention. Jespersen cites to academic literature discussing the cost and time burdens of cosmetics generally, but she presents no evidence as to the cost or time burdens that must be borne by female bartenders in order to comply with the makeup requirement. Even if we were to take judicial notice of the fact that the application of makeup requires *some* expenditure of time and money, Jespersen would still have the burden of producing some evidence that the burdens associated with the makeup requirement are greater than the burdens the "Personal Best" policy imposes on male bartenders, and exceed whatever "burden" is associated with ordinary good-grooming standards. Because there is no evidence in the record from which we can assess the burdens that the "Personal Best" policy imposes on male bartenders either, Jespersen's claim fails for that reason alone.

Jespersen cites *United States v. Seschillie*, 310 F.3d 1208, 1212 (9th Cir.2002), for the proposition that "a jury can make determinations requiring simple common sense without specific supporting evidence." But *Seschillie* involved the entirely different question of whether jurors in a criminal case could draw common-sense inferences from the evidence without the aid of expert testimony. *Id.* It cannot be construed as relieving Jespersen of her burden of production at the summary judgment stage in a civil case. As the non-moving party that bore the ultimate burden of proof at trial, Jespersen had the burden of producing admissible evidence that the "Personal Best" appearance stan-

---

4. Because the question is not presented on this record, we do not need to define the exact parameters of the "unequal burdens" test, as applied to personal appearance and grooming. We do note, however, that this is not an exact science yielding results with mathematical certainty. We further note that any "burden" to be measured under the "unequal burdens" test is only that burden which is imposed beyond the requirements of generally accepted good grooming standards.

dard imposes a greater burden on female beverage servers than it does on male beverage servers. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. She has not met that burden.

Jespersen also contends that even if Harrah's makeup requirement survives the "unequal burdens" test, that test should be invalidated in light of the Supreme Court's decision in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). In *Price Waterhouse,* the Supreme Court held that an employer may not force its employees to conform to the sex stereotype associated with their gender as a condition of employment. *Id.* at 250–51, 109 S.Ct. 1775. When evaluating a female associate's candidacy for partnership in an accounting firm, decision makers referred to her as "macho" and suggested that she "overcompensated for being a woman" by behaving aggressively in the workplace. *Id.* at 235, 109 S.Ct. 1775. The associate was advised that her partnership chances would be improved if she learned to behave more femininely, wear makeup, have her hair styled, and wear jewelry. *Id.* Noting that "we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group," the Court held that the employer's discrimination against the associate because of her failure to conform to a traditional, feminine gender stereotype was sex discrimination in violation of Title VII. *Id.* at 251, 109 S.Ct. 1775.

Following *Price Waterhouse,* we have held that sexual harassment of an employee because of that employee's failure to conform to commonly-accepted gender stereotypes is sex discrimination in violation of Title VII. In *Nichols v. Azteca Restaurant Enter., Inc.,* 256 F.3d 864 (9th Cir.2001), a male waiter at a restaurant sued his employer under Title VII for sexual harassment. The waiter contended that he was harassed because he failed to conform his behavior to a traditionally male stereotype. *Id.* at 874. Noting that *Price Waterhouse* "sets a rule that bars discrimination on the basis of sex stereotypes," we concluded that the harassment and abuse was actionable under Title VII because the waiter was systematically abused for failing to act "as a man should act" and for walking and carrying his tray "like a woman." *Id.* at 874–75. Similarly, in *Rene v. MGM Grand Hotel, Inc.,* 305 F.3d 1061 (9th Cir.2002) (en banc), we held that a man stated a claim for sexual harassment under Title VII where he alleged that he was the victim of assaults "of a sexual nature" by his co-workers because of stereotypical assumptions. *Id.* at 1068.

Although *Price Waterhouse* held that Title VII bans discrimination against an employee on the basis of that employee's failure to dress and behave according to the stereotype corresponding with her gender, it did not address the specific question of whether an employer can impose sex-differentiated appearance and grooming standards on its male and female employees. Nor have our subsequent cases invalidated the "unequal burdens" test as a means of assessing whether sex-differentiated appearance standards discriminate on the basis of sex. Although the precise issue was not before us, we declined to apply *Price Waterhouse* to grooming and appearance standards cases when we rendered our decision in *Nichols,* 256 F.3d at 875 n. 7 ("Our decision does not imply that there is any violation of Title VII occasioned by reasonable regulations that require male and female employees to conform to different dress and grooming standards."). And while a plurality of judges in *Rene* endorsed an independent claim for gender-stereotyping sexual harassment, such a claim is distinct from the claim Jespersen advances here. She has presented no evidence that she or

any other employee has been sexually harassed as a result of the "Personal Best" policy. In short, although we have applied the reasoning of *Price Waterhouse* to sexual harassment cases, we have not done so in the context of appearance and grooming standards cases, and we decline to do so here. We thus disagree with the dissent's assertion that "Jespersen has articulated a classic case of *Price Waterhouse* discrimination...." Dissent at 1084.

Finally, we note that we are, in any event, bound to follow our en banc decision in *Frank*, in which we adopted the unequal burdens test. *Price Waterhouse* predates *Frank* by more than a decade and, presumably, the *Frank* en banc court was aware of it when it adopted the unequal burdens test. Thus, *Price Waterhouse* does not qualify as an "intervening decision" which could serve as a basis for overruling *Frank*. See *EEOC v. Luce, Forward, Hamilton & Scripps*, 345 F.3d 742, 744 n. 1 (9th Cir.2003) (en banc) (explaining that "[a] three-judge panel can overrule a prior decision of this court [only] when an intervening Supreme Court decision undermines an existing precedent of the Ninth Circuit, and both cases are closely on point") (internal quotation marks and citations omitted).

### IV.

We hold that under the "unequal burdens" test, which is this Circuit's test for evaluating whether an employer's sex-differentiated appearance standards constitute sex discrimination in violation of Title VII, Jespersen failed to introduce evidence raising a triable issue of fact as to whether Harrah's "Personal Best" policy imposes unequal burdens on male and female employees.

The judgment of the district court is **AFFIRMED.**

THOMAS, Circuit Judge, dissenting.

I respectfully dissent.

Harrah's required Darlene Jespersen to wear makeup to work. She refused because the cost—measured in time, money, and personal dignity—was too high. Harrah's fired her. The majority holds that Jespersen failed to raise a triable issue of fact as to whether Harrah's policy imposes unequal burdens on men and women. In fact, Jespersen easily satisfied her burden. A reasonable factfinder could determine that Harrah's acted because of Jespersen's sex under not just one theory, but two. First, Harrah's fired Jespersen because of her failure to conform to sex stereotypes, which is discrimination based on sex and is therefore impermissible under Title VII. Second, Jespersen created a triable issue of fact as to whether the policy imposed unequal burdens on men and women, because the policy imposes a requirement on women that is not only time-consuming and expensive, but burdensome for its requirement that women conform to outdated and impermissible sex stereotypes.

### I

Darlene Jespersen was fired from her position as a bartender in a sports bar at Harrah's Casino. There is no question as to why she was fired: because she would not or could not comply with Harrah's stringent company policy requiring female beverage servers to wear foundation, blush, mascara, and lip color, and to ensure that lip color is on at all times. There is also no question that her performance was not only competent; it was spectacular. She was consistently given glowing recommendations by numerous customers and supervisors, despite the fact that she did not wear makeup.

The Harrah's policy is far more stringent than simply asking female employees to wear some makeup. The policy essen-

tially requires women to wear a uniform of makeup including at least mascara, blush, lipstick, and foundation. In fact, according to the "image consultant" who helped implement the policy, wearing makeup "completes" the "uniformed look" of women beverage servers.

All employees at Harrah's were given "image consultations" as part of the "Personal Best" policy, which for women included a makeover that would result in them being "properly made-up." The post-makeover photographs are used as an "appearance measurement tool," and each employee is held "accountable" to the photograph "on a daily basis." Thus, while men are held accountable to look as clean, have their hair as neat, and have their clothes as tidy and fitted as in their photo, women are held accountable to do all these things as well as be "properly made up," as they are in the post-makeover photo.

## II

Under Harrah's "Personal Best" policy, Jespersen was required to wear makeup and thus conform to a sex stereotype; when she refused, Harrah's fired her. When an employer takes an adverse employment action against a plaintiff based on the plaintiff's failure to conform to sex stereotypes, the employer has acted because of sex. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) ("As for the legal relevance of sex stereotyping, we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group, for ... Congress intended to strike at the *entire spectrum* of disparate treatment of men and women resulting from sex stereotypes.") (emphasis added); *see also Smith v. City of Salem*, 369 F.3d 912 (6th Cir.2004) (holding, based on *Price Waterhouse*, that the suspension of a pre-operative transsexual employee based on his gender non-conform-

ing appearance and behavior is actionable under Title VII); *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864 (9th Cir.2001) (holding, based on *Price Waterhouse*, that harassment of a male employee for failure to act masculine enough is actionable under Title VII). Jespersen has articulated a classic case of *Price Waterhouse* discrimination and has tendered sufficient undisputed, material facts to avoid summary judgment.

The majority attempts to distinguish this case from *Price Waterhouse* and *Nichols* because this is not a sexual harassment case. But neither was *Price Waterhouse*, in which the adverse employment action taken against the plaintiff was that she was denied partnership. 490 U.S. at 233, 109 S.Ct. 1775. Even if it were, that would not matter. The question of whether an action is "because of sex" is separate from the question of whether the action constitutes an adverse employment action actionable under Title VII:

> Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discriminat[ion] ... because of ... sex.' We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations.

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (quoting 42 U.S.C. § 2000e–2(a)(1)) (alterations in original). There is no grounding whatsoever in Title VII for the notion that harassing an employee because he or she fails to conform to a sex stereotype is illegitimate, while firing them for the same reason is acceptable.

The majority also suggests that *Price Waterhouse* only applies in certain contexts and did not address sex-differentiated appearance and grooming standards.

In *Price Waterhouse v. Hopkins,* the plaintiff was denied partnership at a prestigious accounting firm where she had excelled because she didn't act femininely enough, and was specifically faulted for not wearing makeup. 490 U.S. at 235, 109 S.Ct. 1775. Jespersen was fired from a job she also excelled at, for exactly the same reason. The distinction created by the majority opinion leaves men and women in service industries, who are more likely to be subject to policies like the Harrah's "Personal Best" policy, without the protection that white-collar professionals receive.

Title VII does not make exceptions for particular industries, and we should not write them in. Pervasive discrimination often persists within an industry with exceptional tenacity, and the force of law is sometimes required to overcome it. *See Gerdom,* 692 F.2d at 606–07 (describing the history of litigation over gender discrimination in the airline industry). When a company acts to enforce sexual stereotypes through grooming standards, it is not immune from *Price Waterhouse* liability; to the contrary, such actions fall precisely within the heartland of *Price Waterhouse.*

### III

Even if *Price Waterhouse* did not apply in the grooming and appearance context, Harrah's was not entitled to summary judgment, for Jespersen created an issue of material fact as to whether the Harrah's policy is a grooming standard that imposes unequal burdens on men and women, in violation of Title VII. *Frank v. United Airlines, Inc.,* 216 F.3d 845, 855 (9th Cir. 2000); *Gerdom v. Continental Airlines, Inc.,* 692 F.2d 602, 606 (9th Cir.1982); *see also Carroll v. Talman Federal Sav. & Loan Ass'n of Chicago,* 604 F.2d 1028, 1032 (7th Cir.1979), *cited with approval in Frank,* 216 F.3d at 855.

The majority opinion's holding that the burdens imposed by all of Harrah's appearance policy requirements must be compared to each other does not follow from prior caselaw permitting employers to maintain sex-differentiated appearance standards that do not impose unequal burdens. Under the majority opinion's methodology, a sex-differentiated appearance requirement that unfairly burdens women, such as a requirement that women meet more stringent weight limits than men, *Frank,* 216 F.3d at 855, could be permissible if the employer unfairly burdened men via another sex-differentiated appearance requirement, for instance, by requiring men to wear contacts but permitting women to wear glasses, *id.*

Rather than permit all sorts of sex discrimination as long as it "balances out" for both genders, I would instead compare individual sex-differentiated appearance requirements that correspond to each other, given that Title VII prohibits employers from taking adverse employment actions "because of ... sex." 42 U.S.C. § 2000e–2(a)(1). Harrah's hair length requirement and ponytail prohibition for men should be compared to the requirement that women wear their hair "teased, curled, or styled" every day and that their hair be "worn down" at all times. Similarly, Harrah's requirement that men keep their hands and fingernails clean and trimmed and not wear colored nail polish should be compared with the rule allowing women to have longer nails, although not of "exotic length," and allowing them to wear clear, white, pink, or red nail polish. Finally, the requirement that women wear makeup and lip color at all times should be compared to the prohibition on makeup for men. If the makeup requirement for women is compared to the clean face requirement for men, there can be no dispute that Jespersen created an issue of material fact as to whether the burdens

are unequal. "A rule which applies only to women, with no counterpart applicable to men, may not be the basis for depriving a female employee who is otherwise qualified of her right to continued employment." *Gerdom*, 692 F.2d at 606 (quoting *Allen v. Lovejoy*, 553 F.2d 522, 524 (6th Cir.1977)).

Furthermore, the majority neglects burdens other than time and money that are imposed by the policy. The sex-stereotyping inherent in certain appearance standards is a burden that falls more heavily on one sex than the other. Thus, we have recognized that the unequal burdens test does not permit sex-differentiated appearance standards that denigrate one gender based on sex stereotypes. *See Gerdom*, 692 F.2d at 606 (quoting *Carroll*, 604 F.2d at 1032–33) ("In *Carroll*, which involved a requirement to wear uniforms, the court noted that while there is nothing offensive about uniforms *per se*, requiring only female employees to wear them is 'disparate treatment ... demeaning to women ... based on offensive stereotypes prohibited by Title VII.' ").

Jespersen testified very compellingly to the burdens she personally felt in complying with the makeup policy, explaining that it required her to conform with a feminine stereotype that she felt had nothing to do with making drinks. Given her stellar customer and supervisor evaluations, Jespersen is obviously not alone in this analysis. Sex-differentiated appearance standards stemming from stereotypes that women are unfit for work, fulfill a different role in the workplace, or are incapable of exercising professional judgment systematically impose a burden on women, converting such stereotypes into a stubborn reality. *See Nevada Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 736, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003) (noting that "mutually reinforcing stereotypes create[ ] a self-fulfilling cycle of discrimination"); *see also*

*Carroll*, 604 F.2d at 1032–33, *cited in Gerdom*, 692 F.2d at 606.

This is not to say that all gender-differentiated appearance requirements are prohibited; what violates Title VII are those that rest upon a message of gender subordination. The distinction is apparent in the history of our caselaw on grooming and appearance standards under Title VII. When early challenges to requirements that men keep their hair short arose in the federal courts, those requirements stemmed not from gender subordination, but from fear of a youth counterculture. *See Willingham v. Macon Tel. Pub'g Co.*, 507 F.2d 1084, 1087, 1092 (5th Cir.1975) (quoting *Dodge v. Giant Food, Inc.*, 488 F.2d 1333, 1337 (D.C.Cir.1973)) ("Neither sex is elevated by these regulations to an appreciably higher occupational level than the other."). Similarly, we have held that requiring men to wear neckties is permissible under Title VII, *Fountain v. Safeway Stores Inc.*, 555 F.2d 753, 755 (9th Cir. 1977). However, we have held that requiring women to wear contacts while men may wear glasses, *Frank*, 216 F.3d at 855, maintain a lower relative weight than men, *id.*, or wear uniforms while men wear appropriate business attire, *id.* (citing *Carroll*, 604 F.2d at 1032), is impermissible under Title VII.

Finally, even if all appearance requirements for men are compared to all appearance requirements for women, and even if the burdens engendered by sex-stereotyping are neglected, a reasonable jury could easily conclude that having to wear approximately as much makeup as one was wearing post-makeover, in addition to teasing, curling, or styling one's hair every day, constitutes more of a burden than having to keep one's hair short and cut one's fingernails. All of these activities are ones with which factfinders have everyday familiarity, and "summary judg-

ment will not lie ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## IV

A reasonable factfinder could conclude that the Harrah's makeup requirement imposes an unequal burden on women, that Jespersen was fired for failure to conform to a sex stereotype, or both. Darlene Jespersen should be allowed to present her case to a jury.

Therefore, I respectfully dissent.