Diane J. SCHROER, Plaintiff,

v.

James H. BILLINGTON, Librarian of Congress, Defendant.

Civil Action No. 05–1090 (JR).

United States District Court, District of Columbia.

Sept. 19, 2008.

294

Arthur B. Spitzer, American Civil Liberties Union, Washington, DC, James D. Esseks, Kenneth Y. Choe, Sharon M. Mcgowan, American Civil Liberties Union Foundation, New York, NY, for Plaintiff.

Beverly Maria Russell, Julia Douds, U.S. Attorney's Office, Evelio Rubiella, Library of Congress, Washington, DC, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JAMES ROBERTSON, District Judge.

Diane Schroer claims that she was denied employment by the Librarian of Congress because of sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1). Evidence was taken in a bench trial on August 19–22, 2008.

### Facts

Diane Schroer is a male-to-female transsexual. Although born male, Schroer has a female gender identity—an internal, psychological sense of herself as a woman. Tr. at 37. In August 2004, before she changed her legal name or began presenting as a woman, Schroer applied for the position of Specialist in Terrorism and International Crime with the Congressional Research Service (CRS) at the Library of Congress. The terrorism specialist provides expert policy analysis to congressional committees, members of Congress and their staffs. Pl.Ex. 1. The position requires a security clearance.

Schroer was well qualified for the job. She is a graduate of both the National War College and the Army Command and General Staff College, and she holds masters degrees in history and international relations. During Schroer's twenty-five years of service in the U.S. Armed Forces, she held important command and staff positions in the Armored Calvary, Airborne, Special Forces and Special Operations Units, and in combat operations in Haiti and Rwanda. Tr. at 22–31. Pl.Ex. 9. Before her retirement from the military in January 2004, Schroer was a Colonel assigned to the U.S. Special Operations Command, serving as the director of a 120–person classified organization that tracked and targeted high-threat international terrorist organizations. In this position, Colonel Schroer analyzed sensitive intelligence reports, planned a range of classified and conventional operations, and regularly briefed senior military and government officials, including the Vice President, the Secretary of Defense, and the Chairman of the Joint Chiefs of Staff. Tr. 32–33. At the time of her military retirement, Schroer held a Top Secret, Sensitive Compartmented Information security clearance, and had done so on a continuous basis since 1987. Tr. at 33. After her retirement, Schroer joined a private consulting firm, Benchmark International, where, when she applied for the CRS position, she was working as a program manager on an infrastructure security project for the National Guard. Tr. at 36.

When Schroer applied for the terrorism specialist position, she had been diagnosed with gender identity disorder and was working with a licensed clinical social worker, Martha Harris, to develop a medically appropriate plan for transitioning from male to female. Tr. at 36–38. The transitioning process was guided by a set of treatment protocols formulated by the leading organization for the study and treatment of gender identity disorders, the Harry Benjamin International Gender Dysphoria Association. Pl.Ex. 45; Tr. at 193. Because she had not yet begun presenting herself as a woman on a full-time basis, however, she applied for the position as "David J. Schroer," her legal name at the time. In October 2004, two months after submitting her application, Schroer was invited to interview with three members of the CRS staff—Charlotte Preece, Steve Bowman, and Francis Miko. Preece, the Assistant Director for Foreign Affairs, Defense and Trade, was the selecting official for the position. Tr. at 103. Schroer attended the interview dressed in tradi-

tionally masculine attire—a sport coat and slacks with a shirt and tie. Tr. at 45.

Schroer received the highest interview score of all eighteen candidates. Pl.Ex. 18. In early December, Preece called Schroer, told her that she was on the shortlist of applicants still in the running, and asked for several writing samples and an updated list of references. Tr. at 49. After receiving these updated materials, the members of the selection committee unanimously recommended that Schroer be offered the job. Tr. at 105. In mid-December, Preece called Schroer, offered her the job, and asked, before she processed the administrative paper work, whether Schroer would accept it. Tr. at 108. Schroer replied that she was very interested but needed to know whether she would be paid a salary comparable to the one she was currently receiving in the private sector. The next day, after Preece confirmed that the Library would be able to offer comparable pay, Schroer accepted the offer, and Preece began to fill out the paperwork necessary to finalize the hire. *Id.*

Before Preece had completed and submitted these documents, Schroer asked her to lunch on December 20, 2004. Schroer's intention was to tell Preece about her transsexuality. She was about to begin the phase of her gender transition during which she would be dressing in traditionally feminine clothing and presenting as a woman on a full-time basis. She believed that starting work at CRS as a woman would be less disruptive than if she started as a man and later began presenting as a woman. Tr. at 53.

When Schroer went to the Library for this lunch date, she was dressed in traditionally masculine attire. Before leaving to walk to a nearby restaurant, Preece introduced her to other staff members as the new hire who would soon be coming aboard. Preece also gave Schroer a short tour of the office, explaining where her new colleagues' offices were and describing Schroer's job responsibilities. Tr. at 56. As they were sitting down to lunch, Preece stated that they were excited to have Schroer join CRS because she was "significantly better than the other candidates." *Id.* Schroer asked why that was so, and Preece explained that her skills, her operational experience, her ability creatively to answer questions, and her contacts in the military and in defense industries made her application superior. Tr. at 56; 110.

About a half hour into their lunch, Schroer told Preece that she needed to discuss a "personal matter." Tr. at 57. She began by asking Preece if she knew what "transgender" meant. Preece responded that she did, and Schroer went on to explain that she was transgender, that she would be transitioning from male to female, and that she would be starting work as "Diane." Preece's first reaction was to ask, "Why in the world would you want to do that?" Tr. at 57, 110. Schroer explained that she did not see being transgender as a choice and that it was something she had lived with her entire life. Preece then asked her a series of questions, starting with whether she needed to change Schroer's name on the hiring documentation. Schroer responded that she did not because her legal name, at that point, was still David. Schroer went on to explain the Harry Benjamin Standards of Care and her own medical process for transitioning. She told Preece that she planned to have facial feminization surgery in early January and assured her that recovery from this surgery was quick and would pose no problem for a mid-January start date. In the context of explaining the Benjamin Standards of Care, Schroer explained that she would be living full-time as a woman for at least a year before having sex reassignment surgery. Such surgery, Schroer explained, could normally

be accomplished during a two-week vacation period and would not interfere with the requirements of the job. Tr. at 59.

Preece then raised the issue of Schroer's security clearance, asking what name ought to appear on hiring documents. Schroer responded that she had several transgender friends who had retained their clearances while transitioning and said that she did not think it would be an issue in her case. Schroer also mentioned that her therapist would be available to answer any questions or provide additional background as needed. Tr. at 60. Because Schroer expected that there might be some concern about her appearance when presenting as a woman, she showed Preece three photographs of herself, wearing traditionally feminine professional attire. Although Preece did not say it to Schroer, her reaction on seeing these photos was that Schroer looked like "a man dressed in women's clothing." Tr. at 112. Preece did not ask Schroer whether she had told her references or anyone at Benchmark of her transition.

Although Schroer initially thought that her conversation with Preece had gone well, she thought it "ominous" that Preece ended it by stating "Well, you've given me a lot to think about. I'll be in touch." Tr. at 63.

Preece did not finish Schroer's hiring memorandum when she returned to the Library after lunch. *See* Pl.Ex. 23.[1] Instead, she went to speak with Cynthia Wilkins, the personnel security officer for the Library of Congress. Preece told Wilkins that she had just learned that the candidate she had planned to recommend

for the terrorism specialist position would be transitioning from male to female and asked what impact that might have on the candidate's ability to get a security clearance. Tr. at 120. Wilkins did not know and said that she would have to look into the applicable regulations. Preece told Wilkins that the candidate was a 25–year military veteran. She did not recall whether or not she mentioned that Schroer currently held a security clearance. Preece did not provide, and Wilkins did not ask for, the sort of information—such as Schroer's full name and social security number—that would have allowed Wilkins access to information on Schroer's clearance history. Had Preece requested her to do so, Wilkins had the ability to access Schroer's complete investigative file through a centralized federal database. Tr. at 272, 279–82.

Preece testified that at this point, without waiting to hear more from Wilkins, she was leaning against hiring Schroer. Tr. at 121–22. She said that Schroer's transition raised five concerns for her. First, she was concerned about Schroer's ability to maintain her contacts within the military. Specifically, Preece thought that some of Schroer's contacts would no longer want to associate with her because she is transgender. Tr. at 113. At no point after learning of Schroer's transition, however, did Preece discuss the continuing viability of her contacts with Schroer, nor did she raise this concern with any of Schroer's references, all of whom in fact knew that she was transitioning. Tr. at 51, 114. Second, Preece was concerned with Schroer's credibility when testifying before

---

1. Her partial, draft memorandum had begun: I recommend Mr. David Schroer for the position of Specialist in Terrorism and International Crime in the Foreign Affairs, Defense, and Trade Division of the Congressional Research Service. His qualifications and experience make[ ] him the best quali-

fied candidate from among the other 8 applicants on the final referral list.
Mr. Schroer has extensive experience as a practitioner and strategic planner in counterterrorism. Since 1986 he was involved in leading counterterrorism and counterinsurgency operations around the world.

Congress. When CRS specialists testify before Congress, they typically provide Members with brief biographical statements to give them credibility. Preece was concerned "that everyone would know that [Schroer] had transitioned from male to female because only a man could have her military experiences." Tr. at 114. Preece thought that this would be an obstacle to Schroer's effectiveness. Tr. at 115. Third, Preece testified that she was concerned with Schroer's trustworthiness because she had not been up front about her transition from the beginning of the interview process. Tr. at 117. Preece did not, however, raise this concern to Schroer during their lunch. Fourth, Preece thought that Schroer's transition might distract her from her job. Although Preece seems to have connected this concern to Schroer's surgeries, she did not ask for additional information about them or otherwise discuss the issue further with Schroer. Tr. at 118. Finally, Preece was concerned with Schroer's ability to maintain her security clearance. In Preece's mind, "David Schroer" had a security clearance, but "Diane Schroer" did not. Even before speaking with Wilkins, Preece "strongly suspected" that David's clearance simply would not apply to Diane. Tr. at 117. She had this concern, but she did not ask Schroer for any information on the people she knew who had undergone gender transitions while retaining their clearances. *Id.*

After her lunch with Schroer, Preece also relayed the details of her conversation to a number of other officials at CRS, including Daniel Mulholland, the Director of CRS, and Gary Pagliano, one of the defense section heads, whose reaction was to ask Preece if she had a good second candidate for the job. Later the same afternoon, Preece received an email from one of the Library's lawyers, setting up a meeting for the next morning to discuss the terrorism specialist position. Tr. at

123. That evening, as Preece thought about the issue, she was puzzled by the idea that "someone [could] go[ ] through the experience of Special Forces [and] decide that he wants to become a woman." Tr. at 124. Schroer's background in the Special Forces made it harder for Preece to think of Schroer as undergoing a gender transition. *Id.*

The next morning, on December 21, 2004, at nine o'clock, Preece met with Kent Ronhovde, the Director of the Library of Congress, Wilkins, and two other members of the CRS staff from workforce development. Tr. at 124. Preece described her lunch conversation with Schroer and stated that Schroer had been, but no longer was, her first choice for the position. Tr. at 126. As Preece recalls the meeting, Wilkins stated that she was unable to say one way or another whether Diane Schroer would be able to get a security clearance. *Id.* at 126. Preece testified that Wilkins proposed that Schroer would have to a have a "psychological fitness for duty examination," after which the Library would have to decide whether to initiate a full background investigation. Wilkins testified that she was not familiar with such an "examination" and likely would not have used such a phrase, Tr. at 290–91, but she confirmed that she told the meeting that she would not approve a waiver for Schroer so that she could start working before the clearance process was complete. Wilkins made this decision without having viewed Schroer's application, her resume, or her clearance status and history. Tr. at 127. Preece understood the substance of Wilkins' comments to be that David's security clearance was not relevant to Diane, and that Diane would need a separate clearance. She assumed that that process could take up to a year.

At no point during the meeting did Preece express a continuing interest in

hiring Schroer. She did not suggest that Wilkins pull and review David Schroer's security file to confirm her own assumption that the security clearance process would be a lengthy one. No one in the meeting asked whether the organization currently holding Schroer's clearance knew of her transition. There was no discussion of whether anyone else at the Library had dealt with a similar situation. Tr. at 128–29.

By the end of the meeting, Preece had made up her mind that she no longer wanted to recommend Schroer for the terrorism specialist position. Tr. at 131. Preece testified that the security clearance was the critical, deciding factor because of "how long it would take." She also testified, however, that she would have leaned against hiring Schroer even if she had no concerns regarding the security clearance, because her second candidate, John Rollins, presented "fewer complications"—because, unlike Schroer, he was not transitioning from male to female. Tr. at 133–34.

Later that day, Preece circulated a draft of what she proposed to tell Schroer to those who had participated in the meeting. The email stated:

David. I'm calling to let you know that I am not going forward with my recommendation to hire you for the terrorism position. In light of what you told me yesterday, I feel that you are putting me and CRS in an awkward position for a number of reasons as you go through this transition period. I am primarily concerned that you could not likely be brought on in a timeframe that is needed for me to fill the position. Our Personnel Security Office has told me that the background investigation process that will be required for you to start work could be lengthy. I am also concerned that the past contacts I had counted on you to bring to the position

may not now be as fruitful as they were in the past. Finally I have concerns that the transition that you are in the process of might divert your full attention away from the mission of CRS. I could be wrong on any one of these complicated factors, but taken together I do not have a high enough degree of confidence to recommend you for the position. Having said that, I very much appreciate your candor and your courage. I wish you the best and want to let you know that you should feel free to[ ] apply for future positions at the Library.

Pl.Ex. 19. Preece was then called into the General Counsel's office for a meeting at eleven o'clock. Afterward, Preece circulated a revised email with the header "Draft per discussion with General Coun[sel]." Pl.Ex. 20. It read:

David, Given the level and the complexities of the position, I don't think this is a good fit. This has been a difficult decision, but given the immediate needs of Congress, I've decided not to go forward with the recommendation.

(Listen. If needed say) That's all I'm prepared to say at this time.

*Id.* Later that same afternoon, Preece called Schroer to rescind the job offer. She said, "Well, after a long and sleepless night, based on our conversation yesterday, I've determined that you are not a good fit, not what we want." Tr. at 63. Schroer replied that she was very disappointed. Preece ended the conversation by thanking Schroer for her honesty. Tr. at 64; 138. Preece then called John Rollins, who had a lower total interview score than Schroer, *see* Pl.Ex. 18, and offered him the position. He accepted.

Since January 2005, Schroer has lived full-time as a woman. Tr. at 66. She has changed her legal name to Diane Schroer and obtained a Virginia driver's license and a United States Uniformed Services

card reflecting her name change and gender transition. Pl.Ex. 7.

### Analysis

It is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). The "ultimate question" in every Title VII case is whether the plaintiff has proved that the defendant intentionally discriminated against her because of a protected characteristic. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The Library argues that it had a number of non-discriminatory reasons for refusing to hire Schroer, including concerns about her ability to maintain or timely receive a security clearance, her trustworthiness, and the potential that her transition would distract her from her job. The Library also argues that a hiring decision based on transsexuality is not unlawful discrimination under Title VII.

After hearing the evidence presented at trial, I conclude that Schroer was discriminated against because of sex in violation of Title VII. The reasons for that conclusion are set forth below, in two parts. First, I explain why, as a factual matter, several of the Library's stated reasons for refusing to hire Schroer were not its "true reasons, but were ... pretext[s] for discrimination," *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Second, I explain why the Library's conduct, whether viewed as sex stereotyping or as discrimination literally "because of ... sex," violated Title VII.

## I.

None of the five assertedly legitimate reasons that the Library has given for refusing to hire Schroer withstands scrutiny.

### A. Security clearance concerns were pretextual

■ Preece has claimed that her primary concern was Schroer's ability to receive a security clearance in a timely manner. It is uncontested that the ability to maintain or receive security clearance is a requirement for the terrorism specialist position. In light of the inquiry that the Library actually made into Schroer's clearance history and the specific facts affecting her case, however, I conclude that this issue was a pretext for discrimination.

Kenneth Lopez, the Library's Director of Security and Emergency Preparedness, and Wilkins' supervisor, testified about the clearance process for new employees. Lopez explained that, in appropriate circumstances, the Library recognizes as a matter of reciprocity the security clearance held by an individual at a prior government agency. Tr. at 247. The three general requirements for reciprocity are that the previous investigation was undertaken in a timely manner, that the investigation had an adequate scope,[2] and that there has not been a significant break in service. When new information that might raise security concerns about a candidate otherwise eligible for reciprocity is raised, the Library evaluates that information before making a decision as to whether to grant reciprocity. Tr. at 251. That there is new information does not necessarily mean that a new, full-scale investigation is needed. Tr. at 285.

---

**2.** "Scope" goes to the thoroughness of the prior investigation based on the level of clearance. Someone who holds only a "Secret" level clearance will not have had as thorough an investigation as someone holding a "Top Secret" clearance. Tr. at 254–55.

When the candidate does not have a valid, prior clearance, the Library may nonetheless grant a waiver so that the person may start work, conditionally employed, before the security investigation has been completed. A waiver is not needed for someone holding a current clearance of appropriate scope. Tr. at 256.

Although Preece knew that Schroer held a security clearance, she did not provide Wilkins with any of the information that might have been needed to see whether reciprocity would apply. Wilkins had the ability to access Schroer's entire security file, but she did not do so-because she was not asked to.

Without any specific information about Schroer—including whether she might have already addressed any issues arising out of her gender transition with the current holder of her security clearance (Benchmark)—Wilkins performed the most general kind of research. She looked into the Adjudication Guidelines and the Adjudication Desk Reference for information about transsexuality and found two potentially relevant guidelines.[3] The first was the sexual behavior guideline, which provides that sexual behavior that causes an individual to be vulnerable to blackmail or coercion may be cause for a security concern. Tr. at 276. Wilkins acknowledged, however, that an individual who has disclosed her transsexuality would not present blackmail concerns. Tr. at 277. The other potentially relevant guideline deals with security concerns raised by emotional, mental or personality disorders. Psychological disorders, including gender identity disorder, are not *per se* disqualify-

ing but are to be evaluated as part of the person's entire background. Tr. at 257. Lopez testified when an employee discloses such a disorder, the proper procedure is for the personnel security officer to consult with the Library's Health Services. After interviewing the candidate and, potentially, his or her mental health providers, a Health Services officer determines whether or not the information raises a security concern. For an individual already holding a clearance, if Health Services is satisfied that the disorder raises no security concerns, the personnel security office proceeds to grant reciprocity. Tr. at 253.

The Library made no effort to determine whether Schroer's previous clearance would receive reciprocal recognition or to determine whether the agency previously holding Schroer's clearance already knew of, and had already investigated any concerns related to Schroer's gender identity disorder. Wilkins stated that she would not approve a waiver without determining whether reciprocity might apply, and therefore without determining whether a waiver actually would have been required. Without being given a concrete time frame by Wilkins, and without speaking to anyone in Health Services, Preece simply "assumed" that it would take a year before Schroer would be fully cleared. This assumption was connected to no specific information about Schroer or her clearance history, and was not informed by the Library's own procedures for adjudicating possible security issues arising from a psychological disorder.[4]

3. Wilkins testified that these guidelines and reference materials implement Executive Order 10450, 18 Fed.Reg. 2489 (1953), and Executive Order 12968, 60 Fed.Reg. 40245 (1995). Tr. at 263.

4. The Library has never argued that Title VII's jurisdictional exemption regarding secu-

rity clearances, 42 U.S.C. § 2000e–2(g), applies in this case, and, unlike in *Department of Navy v. Egan*, 484 U.S. 518, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988), Schroer is not challenging the denial of a security clearance. She asserts, rather, that the Library's failure to follow its own procedures establishes pretext.

The Library's statements about the time pressures that they were operating under to fill the position with someone with a full security clearance, as opposed to a provisional waiver, are not credible. The terrorism specialist opening was first posted in August. Schroer was not interviewed until October and did not receive an offer until mid-December. The person who previously held the job, Audrey Cronin, worked for six months during 2003 before receiving her clearance. Tr. at 438; Pl. Ex. 64. Cronin's first performance evaluation, completed after eight months on the job, in no way reflected that her work had been impaired by the fact that she had lacked a clearance during three quarters of the period under evaluation. Pl.Ex. 65. John Rollins, who ultimately filled the position denied to Schroer, did not receive his final clearance until "several months" after he began working at CRS. Tr. at 304.

### B. Trustworthiness and distraction concerns were pretextual

■ The Library's professed concerns with Schroer's trustworthiness and ability to focus on the job were also pretextual. At trial, the Library conceded as undisputed that Schroer "had no other co-morbidities or stressors that would have prevented her from performing the duties of the terrorism specialist, or that would have presented any issue regarding her stability, judgment, reliability or ability to safeguard classified information." Tr. at 349. Preece's stated concern with Schroer's trustworthiness was belied by the fact that she thanked Schroer for her honesty in the course of rescinding the job offer. If Preece had really been concerned with Schroer's ability to focus on her work responsibilities, she could have raised the matter directly and asked Schroer additional questions about her planned surgeries, asked her current employer and references about Schroer's ability to focus, or spoken with Schroer's therapist, as Schroer had offered. Preece did none of those things.

### C. Credibility and contacts concerns were facially discriminatory

■ The Library's final two proffered legitimate non-discriminatory reasons—that Schroer might lack credibility with Members of Congress, and that she might be unable to maintain contacts in the military—were explicitly based on her gender non-conformity and her transition from male to female and are facially discriminatory as a matter of law. Deference to the real or presumed biases of others is discrimination, no less than if an employer acts on behalf of his own prejudices. See *Williams v. Trans World Airlines, Inc.*, 660 F.2d 1267, 1270 (8th Cir.1981) (firing employee in response to racially charged, unverified customer complaint is direct evidence of racial discrimination by employer); cf. *Fernandez v. Wynn Oil Co.*, 653 F.2d 1273, 1276 (9th Cir.1981) ("stereotypic impressions of male and female roles do not qualify gender as a [bona fide occupational qualification]"); *Diaz v. Pan American World Airways, Inc.*, 442 F.2d 385 (5th Cir.1971) (same). In any event, the Library made no effort to discern if its concern was actually a reasonable one, as it easily could have done by contacting any of the high-ranking military officials that Schroer listed as references. Pl.Ex. 5.

### II.

Schroer contends that the Library's decision not to hire her is sex discrimination banned by Title VII, advancing two legal theories. The first is unlawful discrimination based on her failure to conform with sex stereotypes. The second is that discrimination on the basis of gender identity is literally discrimination "because of . . . sex."

### A. Sex stereotyping

Plaintiff's sex stereotyping theory is grounded in the Supreme Court's decision in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 251, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). In that case, a female senior manager was denied partnership in a large accounting firm in part because she was perceived to be too "macho" for a woman. *Id.* at 235, 109 S.Ct. 1775. Her employer advised that she would improve her chances at partnership if she would "take 'a course at charm school'" and would "'walk more femininely, talk more femininely, dress more femininely, wear makeup, have her hair styled, and wear jewelry.'" *Id.* Justice Brennan observed that it did not "require expertise in psychology to know that, if an employee's flawed 'interpersonal skills' can be corrected by a soft-hued suit or a new shade of lipstick, perhaps it is the employee's sex and not her interpersonal skills that has drawn the criticism." *Id.* at 255, 109 S.Ct. 1775. In ruling for the plaintiff, the Court held that Title VII reaches claims of discrimination based on "sex stereotyping." *Id.* at 250–51, 109 S.Ct. 1775 (plurality opinion); *id.* at 258–261, 109 S.Ct. 1775 (White, J., concurring); *id.* at 272–73, 109 S.Ct. 1775 (O'Connor, J., concurring). "In the specific context of sex stereotyping," the Court explained, "an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender." *Id.* at 250, 109 S.Ct. 1775.

After *Price Waterhouse,* numerous federal courts have concluded that punishing employees for failure to conform to sex stereotypes is actionable sex discrimination under Title VII. *See, e.g., Medina v. Income Support Div.,* 413 F.3d 1131, 1135 (10th Cir.2005) ("[A] plaintiff may satisfy her evidentiary burden [under Title VII] by showing that the harasser was acting to punish the plaintiff's noncompliance with gender stereotypes."); *Bibby v. Phila. Coca Cola Bottling Co.,* 260 F.3d 257, 264 (3d Cir.2001) (Title VII claim is stated when "the harasser was acting to punish the victim's noncompliance with gender stereotypes"); *Nichols v. Azteca Rest. Enters., Inc.,* 256 F.3d 864, 874 (9th Cir.2001) (male plaintiff stated a Title VII claim where he was harassed "for walking and carrying his tray 'like a woman'—i.e., for having feminine mannerisms"); *Higgins v. New Balance Athletic Shoe, Inc.,* 194 F.3d 252, 261 n. 4 (1st Cir.1999) ("Just as a woman can ground an action on a claim that men discriminated against her because she did not meet stereotyped expectations of femininity, a man can ground a claim on evidence that other men discriminated against him because he did not meet stereotypical expectations of masculinity."); *Doe v. City of Belleville,* 119 F.3d 563, 581 (7th Cir.1997) ("a man who is harassed because his voice is soft, his physique is slight, his hair is long, or because in some other respect he ... does not meet his coworkers' idea of how men are to appear and behave, is harassed 'because of' his sex"), *vacated and remanded on other grounds,* 523 U.S. 1001, 118 S.Ct. 1183, 140 L.Ed.2d 313 (1998).

Following this line of cases, the Sixth Circuit has held that discrimination against transsexuals is a form of sex stereotyping prohibited by *Price Waterhouse* itself:

> After *Price Waterhouse,* an employer who discriminates against women because, for instance, they do not wear dresses or makeup, is engaging in sex discrimination that would not occur but for the victim's sex. It follows that employers who discriminate against men because they do wear dresses and makeup, or otherwise act femininely, are also engaging in discrimination, because the discrimination would not occur but for the victim's sex.
>
> . . .

[D]iscrimination against a plaintiff who is transsexual—and therefore fails to act and/or identify with his or her gender—is no different from the discrimination directed against Ann Hopkins in *Price Waterhouse*, who, in sex-stereotypical terms, did not act like a woman. Sex stereotyping based on a person's gender nonconforming behavior is impermissible discrimination, irrespective of the cause of that behavior.

*Smith v. Salem*, 378 F.3d 566, 574–75 (6th Cir.2004); *see also Barnes v. City of Cincinnati*, 401 F.3d 729, 737 (6th Cir.2005). In my 2006 memorandum denying the Library's motion to dismiss, in this case, I expressed reservations about the Sixth Circuit's broad reading of *Price Waterhouse.* I explained that "[n]either the logic nor the language of *Price Waterhouse* establishes a cause of action for sex discrimination in every case of sex stereotyping." *Schroer v. Billington*, 424 F.Supp.2d 203, 208 (D.D.C.2006). I held that what *Price Waterhouse* actually recognized was a Title VII action for *disparate treatment,* as between men and women, based on sex stereotyping. Accordingly, I concluded that "[a]dverse action taken on the basis of an employer's gender stereotype that does not impose unequal burdens on men and women does not state a claim under Title VII." *Id.* at 209. While I agreed with the Sixth Circuit that a plaintiff's transsexuality is not a bar to a sex stereotyping claim, I took the position that "such a claim must actually arise from the employee's appearance or conduct and the employer's stereotypical perceptions." *Id.* at 211. In other words, "a *Price–Waterhouse* claim could not be supported by facts showing that [an adverse employment action] resulted *solely* from [the plaintiff's] disclosure of her gender dysphoria." *Schroer v. Billington*, 525 F.Supp.2d 58, 63 (D.D.C.2007).

That was before the development of the factual record that is now before me.

My conclusion about a disparate treatment requirement relied heavily on the panel decision in *Jespersen v. Harrah's Operating Co.*, 392 F.3d 1076 (9th Cir. 2004). That decision was later affirmed *en banc. Jespersen v. Harrah's Operating Co.*, 444 F.3d 1104, 1109 (9th Cir.2006). The defendant in *Jespersen* had instituted a company-wide "Personal Best" grooming policy, which, in addition to gender-neutral standards of fitness and professionalism, required women to wear stockings and colored nail polish, to wear their hair "teased, curled, or styled," and to wear make-up. 392 F.3d at 1077. The policy also prohibited men from wearing makeup, nail polish, or long hair. Plaintiff Darlene Jespersen was fired for refusing to wear makeup, which she testified made "her feel sick, degraded, exposed and violated," "forced [ ] to be feminine," and "dolled up" like a sexual object. *Id.* Despite the subjective, gender-related toll that the policy exacted from Jespersen, the Ninth Circuit held that firing her for non-compliance with the policy did not violate Title VII, since, in that court's judgment, the "Personal Best" policy imposed equally burdensome, although gender-differentiated, standards on men and women.

In her post-trial briefing, Schroer convincingly argues that *Jespersen's* disparate treatment requirement ought not apply in this case. Unlike *Jespersen*, this case does not involve a generally applicable, gender-specific policy, requiring proof that the policy itself imposed unequal burdens on men and women. Instead, Schroer argues that her *direct evidence* that the Library's hiring decision was motivated by sex stereotypical views renders proof of disparate treatment unnecessary.[5]

---

5. For example, in *Oncale v. Sundowner Offshore Services, Inc.*, the male plaintiff complaining of sexual harassment in violation of Title VII had been "forcibly subjected to sex-

Schroer's case indeed rests on direct evidence, and compelling evidence, that the Library's hiring decision was infected by sex stereotypes. Charlotte Preece, the decisonmaker, admitted that when she viewed the photographs of Schroer in traditionally feminine attire, with a feminine hairstyle and makeup, she saw a man in women's clothing. Tr. at 112–13. In conversations Preece had with colleagues at the Library after her lunch with Schroer, she repeatedly mentioned these photographs. Tr. at 120–21, 172–73. Preece testified that her difficulty comprehending Schroer's decision to undergo a gender transition was heightened because she viewed David Schroer not just as a man, but, in light of her Special Forces background, as a particularly masculine kind of man. Tr. at 124. Preece's perception of David Schroer as especially masculine made it all the more difficult for her to visualize Diane Schroer as anyone other than a man in a dress. *Id.* Preece admitted that she believed that others at CRS, as well as Members of Congress and their staffs, would not take Diane Schroer seriously because they, too, would view her as a man in women's clothing. *Tr.* at 112–15, 132–34.

What makes Schroer's sex stereotyping theory difficult is that, when the plaintiff is transsexual, direct evidence of discrimination based on sex stereotypes may look a great deal like discrimination based on transsexuality itself, a characteristic that, in and of itself, nearly all federal courts have said is unprotected by Title VII. *See Ulane v. Eastern Airlines,* 742 F.2d 1081,

1085 (7th Cir.1984); *Sommers v. Budget Mktg., Inc.,* 667 F.2d 748, 750 (8th Cir. 1982); *Holloway v. Arthur Andersen & Co.,* 566 F.2d 659, 662–63 (9th Cir.1977); *Doe v. U.S. Postal Service,* 1985 U.S. Dist. LEXIS 18959, 1985 WL 9446, *2 (D.D.C. 1985). Take Preece's testimony regarding Schroer's credibility before Congress. As characterized by Schroer, the Library's credibility concern was that she "would not be deemed credible by Members of Congress and their staff because people would perceive her to be a woman, and would refuse to believe that she could possibly have the credentials that she had." [Dkt. 67 at 7]. Plaintiff argues that this is "quintessential sex stereotyping" because Diane Schroer is a woman and does have such a background. *Id.*[6] But Preece did not testify that she was concerned that Members of Congress would perceive Schroer simply to be a woman. Instead, she testified that "everyone would know that [Schroer] had transitioned from male to female because only a man could have her military experiences." Tr. at 114.

Ultimately, I do not think that it matters for purposes of Title VII liability whether the Library withdrew its offer of employment because it perceived Schroer to be an insufficiently masculine man, an insufficiently feminine woman, or an inherently gender-nonconforming transsexual. One or more of Preece's comments could be parsed in each of these three ways. While I would therefore conclude that Schroer is entitled to judgment based on a *Price Waterhouse*-type claim for sex stereotyping, I also conclude that she is entitled to judg-

---

related, humiliating actions" and had been "physically assaulted . . . in a sexual manner" by other male co-workers. 523 U.S. 75, 77, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). The Supreme Court did not require Oncale to show that he had been treated worse than women would have been treated, but only that "he suffered discrimination *in comparison to other men." Rene v. MGM Grand Ho-*

*tel, Inc.,* 305 F.3d 1061, 1067 (9th Cir.2002) (en banc) (emphasis in original).

**6.** Plaintiff also presented the testimony of Dr. Kalev Sepp, Deputy Assistant Secretary of Defense for Special Operations, that women have served in the Special Forces since the 1970s. *Id.* at 98–99.

ment based on the language of the statute itself.

### B. Discrimination because of sex

Schroer's second legal theory is that, because gender identity is a component of sex, discrimination on the basis of gender identity is sex discrimination. In support of this contention, Schroer adduced the testimony of Dr. Walter Bockting, a tenured associate professor at the University of Minnesota Medical School who specializes in gender identity disorders. Dr. Bockting testified that it has long been accepted in the relevant scientific community that there are nine factors that constitute a person's sex. One of these factors is gender identity, which Dr. Bockting defined as one's personal sense of being male or female.[7] Tr. at 210.

The Library adduced the testimony of Dr. Chester Schmidt, a professor of psychiatry at the Johns Hopkins University School of Medicine and also an expert in gender identity disorders. Dr. Schmidt disagreed with Dr. Bockting's view of the prevailing scientific consensus and testified that he and his colleagues regard gender identity as a component of "sexuality" rather than "sex." According to Dr. Schmidt, "sex" is made up of a number of facets, each of which has a determined biologic etiology. Dr. Schmidt does not believe that gender identity has a single, fixed etiology. Tr. at 372, 400–04.

The testimony of both experts—on the science of gender identity and the relationship between intersex conditions and transsexuality—was impressive. Resolving the dispute between Dr. Schmidt and Dr. Bockting as to the proper scientific definition of sex, however, is not within this Court's competence. More importantly (because courts render opinions about scientific controversies with some regularity), deciding whether Dr. Bokting or Dr. Schmidt is right turns out to be unnecessary.

■ The evidence establishes that the Library was enthusiastic about hiring David Schroer—until she disclosed her transsexuality. The Library revoked the offer when it learned that a man named David intended to become, legally, culturally, and physically, a woman named Diane. This was discrimination "because of ... sex."

Analysis "must begin ... with the language of the statute itself" and "[i]n this case it is also where the inquiry should end, for where, as here, the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'" *United States v. Ron Pair Enters.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (quoting *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917)).

Imagine that an employee is fired because she converts from Christianity to Judaism. Imagine too that her employer testifies that he harbors no bias toward either Christians or Jews but only "converts." That would be a clear case of discrimination "because of religion." No court would take seriously the notion that "converts" are not covered by the statute. Discrimination "because of religion" easily encompasses discrimination because of a *change* of religion. But in cases where the plaintiff has changed her sex, and faces discrimination because of the decision to

---

7. The other eight factors, according to Dr. Bockting, are chromosomal sex, hypothalamic sex, fetal hormonal sex, pubertal hormonal sex, sex of assignment and rearing, internal morphological sex, external morphological sex, and gonads.

stop presenting as a man and to start appearing as a woman, courts have traditionally carved such persons out of the statute by concluding that "transsexuality" is unprotected by Title VII. In other words, courts have allowed their focus on the label "transsexual" to blind them to the statutory language itself.

In *Ulane v. Eastern Airlines*, the Seventh Circuit held that discrimination based on sex means only that "it is unlawful to discriminate against women because they are women and against men because they are men." The Court reasoned that the statute's legislative history "clearly indicates that Congress never considered nor intended that [Title VII] apply to anything other than the traditional concept of sex." 742 F.2d 1081, 1085 (7th Cir.1981). The Ninth Circuit took a similar approach, holding that Title VII did not extend protection to transsexuals because Congress's "manifest purpose" in enacting the statute was only "to ensure that men and women are treated equally." *Holloway v. Arthur Andersen & Co.*, 566 F.2d 659, 663 (9th Cir.1977). More recently, the Tenth Circuit has also held that because "sex" under Title VII means nothing more than "male and female," the statute only extends protection to transsexual employees "if they are discriminated against because they are male or because they are female." *Etsitty v. Utah Transit Authority*, 502 F.3d 1215, 1222 (10th Cir.2005).

The decisions holding that Title VII only prohibits discrimination against men because they are men, and discrimination against women because they are women,

represent an elevation of "judge-supposed legislative intent over clear statutory text." *Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, 550 U.S. 81, 127 S.Ct. 1534, 1551, 167 L.Ed.2d 449 (2007) (Scalia, J., dissenting).[8] In their holdings that discrimination based on changing one's sex is not discrimination because of sex, *Ulane*, *Holloway*, and *Etsitty* essentially reason "that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers." *Church of the Holy Trinity v. United States*, 143 U.S. 457, 459, 12 S.Ct. 511, 36 L.Ed. 226 (1892). This is no longer a tenable approach to statutory construction. *See Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 473, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989) (Kennedy, J., concurring). Supreme Court decisions subsequent to *Ulane* and *Holloway* have applied Title VII in ways Congress could not have contemplated. As Justice Scalia wrote for a unanimous court:

> Male-on-male sexual harassment in the workplace was assuredly not the principal evil Congress was concerned with when it enacted Title VII. But statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed.

*Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 79, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

For Diane Schroer to prevail on the facts of her case, however, it is not neces-

---

**8.** Discrimination because of race has never been limited only to discrimination for being one race or another. Instead, courts have recognized that Title VII's prohibition against race discrimination protects employees from being discriminated against because of an interracial marriage, or based on friendships that cross racial lines. *See, e.g., McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1118 (9th Cir.2004).

sary to draw sweeping conclusions about the reach of Title VII. Even if the decisions that define the word "sex" in Title VII as referring only to anatomical or chromosomal sex are still good law—after that approach "has been eviscerated by *Price Waterhouse,*" *Smith,* 378 F.3d at 573—the Library's refusal to hire Schroer after being advised that she planned to change her anatomical sex by undergoing sex reassignment surgery was *literally* discrimination "because of . . . sex."

In 2007, a bill that would have banned employment discrimination on the basis of sexual orientation and gender identity was introduced in the House of Representatives. *See* H.R.2015, 110 Cong., 1st Sess. (2007). Two alternate bills were later introduced: one that banned discrimination only on the basis of sexual orientation, H.R. 3685, 110 Cong., 1st Sess. (2007), and another that banned only gender identity discrimination, H.R. 3686, 110 Cong., 1st Sess. (2007). None of those bills was enacted.

The Library asserts that the introduction and non-passage of H.R.2015 and H.R. 3686 shows that transsexuals are not currently covered by Title VII and also that Congress is content with the status quo. However, as Schroer points out, another reasonable interpretation of that legislative non-history is that some Members of Congress believe that the *Ulane* court and others have interpreted "sex" in an unduly narrow manner, that Title VII means what it says, and that the statute requires, not amendment, but only correct interpretation. As the Supreme Court has explained,

> [S]ubsequent legislative history is a hazardous basis for inferring the intent of an earlier Congress. It is a particularly dangerous ground on which to rest an interpretation of a prior statute when it concerns, as it does here, a proposal that does not become law. Congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change.

*Pension Ben. Guar. Corp. v. LTV Corp.,* 496 U.S. 633, 650, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990) (internal citations and quotation marks omitted).

### *Conclusion*

In refusing to hire Diane Schroer because her appearance and background did not comport with the decisionmaker's sex stereotypes about how men and women should act and appear, and in response to Schroer's decision to transition, legally, culturally, and physically, from male to female, the Library of Congress violated Title VII's prohibition on sex discrimination.

The Clerk is directed to set a conference to discuss and schedule the remedial phase of this case.